ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL III

| | | |
|---|---|---|
| OFICINA DEL COMISIONADO DE INSTITUCIONES FINANCIERAS DE PUERTO RICO<br><br>Parte Recurrida<br><br><br>v.<br><br><br>TBB INTERNATIONAL BANK, CORP.<br><br>Parte Recurrente | KLRA202400610 | *Revisión Judicial,* procedente de la Oficina del Comisionado de Instituciones Financieras de Puerto Rico<br><br>Caso Núm.: C24-D-002<br><br>Sobre: Violaciones a la Ley Núm. 52 de 11 de agosto de 1989, según enmendada, conocida como la "Ley Reguladora del Centro Bancario Internacional" y al Reglamento Núm. 5653. |

Panel integrado por su presidente, el Juez Figueroa Cabán, el Juez Salgado Schwarz y el Juez Monge Gómez.

Monge Gómez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 5 de diciembre de 2024.

Compareció ante este Tribunal la parte recurrente, TBB International Bank Corp. (en adelante, "TBB" o "Recurrente"), mediante recurso de revisión judicial presentado el 30 de octubre de 2024. Nos solicitó la revocación de la *Resolución y Orden Final de Nombramiento de Síndico y Revocación de Licencia* (en adelante, "Resolución") emitida y notificada por la Oficina del Comisionado de Instituciones Financieras de Puerto Rico (en adelante, "OCIF" o "Recurrida") el 6 de septiembre de 2024. Dicho dictamen fue objeto de una "**Moción de Reconsideración de Resolución y Orden Final de Nombramiento Permanente de Síndico y Revocación de Licencia**" interpuesta por TBB, sobre la cual la OCIF no tomó ninguna determinación.

Por los fundamentos que expondremos a continuación, *confirmamos* la *Resolución* recurrida.

**I.**

El caso de autos tuvo su origen el 29 de febrero de 2024, con la presentación de una "**Querella y Orden de Nombramiento Provisional y Permanente de Síndico Revocación de Licencia**" (en adelante, la "Querella y Orden") por parte de la OCIF en contra de TBB. En la misma, sostuvo que dicha querella constituía una acción de emergencia de carácter sumario que perseguía atender un peligro inminente para la seguridad de la industria de entidades bancarias internacionales que operan desde la jurisdicción de Puerto Rico, garantizar el total y estricto cumplimiento de todas las leyes y/o reglamentos aplicables a las licencias expedidas por la OCIF y evitar que se cause un daño irreparable a los intereses de TBB.

Asimismo, expresó que el 10 de febrero de 2020 suscribió con el Recurrente cierto contrato intitulado "**Emergency Consent Order**", a fin de resguardar los intereses de los depositantes y del público en general. Indicó que la referida orden requería que TBB desarrollara un plan de reestructuración y asignara un comité de depositantes de la entidad, encabezado por el Sr. Fortunato Benacerraf Farías (en adelante, "el señor Benacerraf Farías"). Alegó que luego de haber sido aprobado el plan, la entidad reconoció que para el 30 de abril de 2020 su capital estimado era de negativo $37,501,628.90. Resaltó que la implementación de dicho plan estaba condicionada a que el Recurrido tuviera acceso continuo a su cuenta maestra en el Banco de la Reserva Federal de Nueva York. Manifestó que el 6 de marzo de 2020, dictó una orden que dejaba sin efecto el "**Emergency Consent Order**" y obligaba a la entidad a cumplir con ciertos términos y condiciones, específicamente a: (1) cumplir plenamente con los términos establecidos en el plan; (2) mantener un nivel adecuado de capital en la operación de la entidad; (3) efectuar los pagos de depósitos en un plazo de cinco años y (4) operar en conformidad con las leyes y reglamentos aplicables.

Adujo que el 7 de junio de 2022, el Banco de la Reserva Federal de Nueva York le notificó a TBB que su cuenta maestra se cerraría a partir del

15 de agosto de 2022. Argumentó que, como consecuencia de lo anterior, a TBB se le requirió trasladar los fondos restantes de dicha cuenta a otra institución antes del 30 de septiembre de 2022. Expresó que el 11 de octubre de 2022 se aprobó una modificación a la Sección IX del mencionado plan, a través del cual se eliminó cierta disposición que establecía que TBB pasaría a una sindicatura si perdía la cuenta maestra. Afirmó que la junta de directores del Recurrente determinó que era necesario reestructurarse para continuar operando en beneficio de sus depositantes y clientes, por lo que el 9 de diciembre de 2022 presentó una propuesta para un nuevo plan de restructuración que contemplaba la conversión de ciertos depósitos en acciones. Señaló que el 15 de diciembre de 2022 la OCIF celebró una reunión con los representantes de TBB, a través de la cual les solicitó información adicional en relación con dicha propuesta. Manifestó que, mediante una carta fechada al 4 de abril de 2023, le concedió al Recurrente un plazo de 90 días para presentar un nuevo plan de reestructuración. Mencionó que, el 17 de mayo de 2023, TBB presentó una segunda propuesta, que incluía lo siguiente: (1) la organización de una nueva entidad financiera internacional a la que se le transferirían ciertos activos y pasivos de TBB; (2) TBB renunciaría a su licencia otorgada por la OCIF, en virtud de la Ley Núm. 52 de 11 de agosto de 1989, *infra*; (3) TBB continuaría operando como una corporación regular bajo un plan de liquidación voluntario y (4) TBB conservaría los depósitos retenidos, las demandas presentadas por sí mismo y otros activos.

Sostuvo que el 24 de mayo de 2023 los representantes legales de TBB le comunicaron que la entidad había decidido posponer el pago de ciertos depósitos que vencían el 3 de junio de 2023 y que no tuvo objeción a dicho aplazamiento. Destacó que el 1 de septiembre de 2023 TBB presentó una tercera propuesta que consistía en tablas de Excel, sobre la cual emitió comentarios y solicitó un borrador actualizado. Enunció que el 22 de septiembre de 2023, el Recurrente presentó parte de la información solicitada. Expresó que el 17 de octubre de 2023 TBB presentó una cuarta propuesta denominada "**Plan de Restructuración; TBB International Bank Corp.; 17**

**de octubre de 2023**". Subrayó que, al día siguiente, le notificó a TBB que había asignado a la corporación Driven P.S.C. (en adelante, "Driven") para evaluar la viabilidad de la cuarta propuesta, los datos financieros y las operaciones de TBB al 30 de septiembre de 2023. Expresó que el 31 de enero de 2024, Driven le presentó su informe final relativo a la situación financiera y la viabilidad de la cuarta propuesta, y que el 16 de febrero de 2024 le envió a TBB una carta en la que le pidió que comentara sobre dicho informe.

Del mismo modo, alegó que, desde el inicio de la operación financiera en Puerto Rico del Recurrente, le ha garantizado su debido proceso de ley en el curso de todos los trámites administrativos ante el ente regulador. Indicó que, a pesar de haber realizado múltiples gestiones para evidenciar el cumplimiento de la Ley Núm. 52 de 11 de agosto de 1989, *infra*, TBB no ha cumplido con los requisitos legales relacionados al capital mínimo para operar una entidad bancaria internacional de manera viable. Finalmente, expresó que la Comisionada de la OCIF tenía razones suficientes en derecho para concluir que la situación de TBB era de tal naturaleza que estaba causando o pudiera causar un daño irreparable a los intereses de la misma o de las personas y entidades con fondos o valores en dicha institución. Así pues, designó a Driven como síndico de TBB, con el fin de que, en términos generales, llevara a cabo la liquidación de dicha institución financiera, lo cual incluía la toma de posesión de los activos y pasivos, el cobro de préstamos, cargos u honorarios adeudados a la entidad, el pago de obligaciones y deudas, así como la supervisión de la misma. Además, le revocó a TBB la licencia de entidad bancaria internacional.

Posteriormente, el 1 de marzo de 2024, la OCIF emitió una "**Resolución y Orden Designando Oficial Examinador**", mediante la cual designó al Lcdo. Luis Torres Méndez como oficial examinador del caso, otorgándole la autoridad para presidir la vista administrativa y pautar los eventos procesales pertinentes, en conformidad con las facultades que le fueron delegadas. Así las cosas, el 5 de marzo de 2024, TBB presentó su "**Contestación a Querella y/o Solicitud de Desestimación**" (en adelante,

"Contestación") en la que negó la mayoría de las alegaciones expuestas en su contra y aclaró que el plan que aprobó el 5 de marzo de 2020 fue analizado y aprobado por la OCIF, como acto oficial de la agencia. Igualmente, alegó que la sindicatura establecida por la OCIF provoca que alrededor de $34 millones en acciones comunes de TBB se conviertan en depósitos del banco, diluyendo así a todos los depositantes y creando un daño irreparable a los intereses de TBB y de las personas y entidades con fondos o valores en dicha institución. Resaltó que los hechos relatados por la OCIF demuestran que TBB intentó, en varias ocasiones, adoptar un plan de restructuración para evitar los efectos del Artículo IX del plan aceptado por la OCIF. Señaló que la OCIF omitió incluir en la *Querella y Orden,* entre otros, los siguientes hechos: (1) los depositantes de TBB capitalizaron al banco en exceso de $34 millones, lo cual eliminó en su totalidad el déficit de capital realizado bajo la gerencia anterior; (2) TBB continuó capitalizando positivamente y en cumplimiento con los requisitos de la Ley Núm. 52 de 11 de agosto de 1989, *infra*; (3) que no fue hasta que se terminó la cuenta maestra que la valorización del intangible tuvo el efecto de reflejar una capitalización negativa; (4) después de la pérdida de la cuenta maestra, TBB comenzó un proceso de negociación de un nuevo plan de reestructuración dirigido a evitar la sindicatura y la dilución de los depositantes; y (5) la OCIF tuvo la oportunidad de evitar la sindicatura y las pérdidas sustanciales a los depositantes del banco. En resumen, el Recurrente argumentó que el nombramiento de un síndico no procedía en el presente caso por ser de carácter extraordinario, que la *Querella y Orden* era inconstitucional de su faz, que la OCIF no cumplió con los requisitos procesales requeridos para el nombramiento del síndico y que la sindicatura ponía en riesgo la producción de documentos requeridos por autoridades del orden público.

Tras varios trámites procesales impertinentes a la controversia ante nos, la vista administrativa se llevó a cabo el 14 de mayo de 2024. Allí, testificaron las siguientes personas: (1) la ayudante ejecutiva de la OCIF, la Sra. Karen Rosario Meléndez (en adelante, "la señora Rosario Meléndez"),

(2) el socio administrador de Driven, el Sr. Ryan Luis Marín Charneco (en adelante, el "señor Marín Charneco"), (3) el ex presidente de la Junta de Directores de TBB, el señor Benacerraf Farías, y (4) la asesora de TBB, la Sra. Nora Josefina Valera Ventura (en adelante, "la señora Valera Ventura"). La prueba documental presentada fue la siguiente: (1) el *Consent Order* del 23 de mayo de 2022, (2) la *Querella y Orden*, (3) la carta sobre notificación al Gobernador de 10 de marzo de 2022 y (4) las credenciales del señor Marín Charneco.

El 10 de junio de 2024, el oficial examinador emitió una *Orden* a través de la cual le solicitó a las partes la presentación de memoriales de derecho que contuvieran sus respectivas posiciones referente a la prueba desfilada. En respuesta a ello, el 28 de junio de 2024, la OCIF presentó una "**Moción Sometiendo Memorando de Derecho y en Cumplimiento de Orden**", en la que reiteró los argumentos expuestos en la *Querella y Orden* y sostuvo que la prueba desfilada en la vista confirmó que TBB se encontraba en estado de insolvencia para el 30 de septiembre de 2023 y que continuaba en dicho estado al momento de la designación del síndico provisional. Además, afirmó que el Informe provisto por Driven demostró que TBB carece de una situación económica sólida, lo cual coloca a las personas y entidades que tienen fondos o valores bajo su custodia en un peligro inminente de ser defraudados y sufrir un daño irreparable. Por su parte, TBB presentó su "**Memorando en Apoyo de la Posición de la Parte Querellada**", mediante el cual recalcó las alegaciones expuestas en su *Contestación* y enfatizó que la OCIF le revocó su licencia sin notificación alguna y sin la celebración de una vista, por lo que no cumplió con los requisitos procesales exigidos por la Ley Núm. 52 de 11 de agosto de 1989, *infra*. Del mismo modo, indicó que el Artículo 10 (b) de la Ley Núm. 4 de 11 de octubre de 1985, *infra*, aplica únicamente cuando no existe una disposición específica que regule la institución financiera en controversia y que, en el presente caso, ya existe una disposición a tal efecto.

Finalmente, el 6 de septiembre de 2024, la OCIF emitió una "**Resolución y Orden Final de Nombramiento Permanente de Síndico y**

**Revocación de Licencia**", en la que acogió el Informe del oficial examinador y concluyó que poseía la facultad de supervisar y fiscalizar las instituciones financieras que operan en Puerto Rico mediante exámenes, investigaciones o inspecciones. Igualmente, determinó que a TBB se le concedieron todas las garantías extrajudiciales y procesales necesarias para que la orden de sindicatura se tornara permanente. Así pues, ordenó la revocación inmediata de la licencia de TBB. Además, le ordenó al Recurrente a: (1) pagar una multa de cincuenta mil dólares ($50,000.00) por no cumplir con el "**Lifting Order**" y el Plan de Restructuración del 5 de marzo de 2020, en violación al Artículo 20 (c) de la Ley Núm. 4 de 11 de octubre de 1985, *infra*; (2) pagar una multa de diez mil dólares ($10,000.00) por no cumplir con el nivel de solvencia y/o capital mínimo requerido por la Sección 2 (e) la Ley Núm. 52 de 11 de agosto de 1989, *infra*; (3) someterse a un proceso de disolución y liquidación para asegurar los depósitos de sus clientes y (4) entregar a la OCIF el dinero correspondiente al certificado de depósito por la cantidad de $300,000.00. Insatisfecho con esta decisión, el 16 de septiembre de 2024, TBB presentó una "**Moción de Reconsideración de Resolución y Orden Final de Nombramiento Permanente de Síndico y Revocación de Licencia**" sobre la cual la OCIF no tomó ninguna determinación.

Inconforme con lo anterior, TBB recurrió ante nos mediante el recurso de revisión judicial que nos ocupa y le imputó a la OCIF la comisión de los siguientes errores:

**PRIMER ERROR: ERRÓ LA OCIF AL NOMBRAR UN SÍNDICO AL AMPARO DE LA LEY 4 PUES LA OCIF NO TENÍA AUTORIDAD PARA HACERLO AL AMPARO DE DICHA LEY 4.**

**SEGUNDO ERROR: ERRÓ LA OCIF AL NO CUMPLIR CON LOS REQUISITOS PARA NOMBRAR UN SÍNDICO BAJO LA LEY 52, Y EN LA ALTERNATIVA, BAJO LA LEY 4.**

**TERCER ERROR: ERRÓ LA OCIF AL ACTUAR EN CONTRA DE LOS DERECHOS CONSTITUCIONALES DEL BANCO AL OBLIGARLO A DILUCIDAR CONTROVERSIAS CONTRA EL SÍNDICO EXCLUSIVAMENTE EN UN PROCESO ADMINISTRATIVO ANTE LA OCIF.**

**CUARTO ERROR: ERRÓ LA OCIF EN REVOCAR LA LICENCIA DEL BANCO BAJO LA LEY 52 SIN NOTIFICACION Y VISTA PREVIA COMO REQUIERE LA LEY.**

**QUINTO ERROR: ERRÓ LA OCIF EN IMPONER MULTAS AL BANCO EN VIOLACIÓN DEL DEBIDO PROCESO DE LEY.**

**SEXTO ERROR: ERRÓ LA OCIF AL INCORPORAR POR REFERENCIA LAS DISPOSICIONES DEL FDIC EN LA ORDEN DE NOMBRAMIENTO DE SÍNDICO PUES LA OCIF NO TIENE LOS MISMOS PODERES QUE EL FDIC EN EL PROCESO DE LIQUIDACIÓN Y SINDICATURA DE UN BANCO COMERCIAL.**
**SÉPTIMO ERROR: ERRÓ LA OCIF EN SU CONCLUSIÓN DE HECHO 43 PUES NO ESTÁ SUSTENTADA EN EL EXPEDIENTE ADMINISTRATIVO Y EN LA EVIDENCIA PRESENTADA.**

El 2 de diciembre de 2024, la OCIF compareció mediante "**Alegato en Oposición a Recurso de Revisión Judicial**".

Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

**II.**

**A.**

Es norma reiterada en nuestro ordenamiento jurídico que los tribunales apelativos están llamados a abstenerse de intervenir en las decisiones administrativas, ya que éstas poseen una presunción de legalidad y corrección. ECP Incorporated v. OCS, 205 DPR 268, 281 (2020); Torres Rivera v. Policía de PR, 196 DPR 606, 626 (2016). Cónsono con ello, se ha resuelto que las decisiones de las agencias administrativas gozan de la mayor deferencia por los tribunales. Oficina de Ética Gubernamental v. Martínez Giraud, 210 DPR 79, 88-89 (2022). Ello debido a que dichos entes gubernamentales son los que poseen el conocimiento especializado y experiencia en los asuntos que les son encomendados. Super Asphalt v. AFI, 206 DPR 803, 819 (2021). En los casos de revisión judicial, "[e]l criterio a aplicarse no es si la decisión administrativa es la más razonable o la mejor al arbitrio del foro judicial; es, repetimos, si la determinación administrativa, en interpretación de los reglamentos y las leyes que le incumbe implementar, es una razonable". Rivera Concepción v. A.R.Pe, 152 DPR 116, 124 (2000).

La Sección 4.5 de la LPAU, dispone que "[l]as determinaciones de hechos de las decisiones de las agencias serán sostenidas por el tribunal, si se basan en evidencia sustancial que obra en el expediente administrativo". 3

LPRA sec. 9675. Así pues, la intervención judicial en estos casos ha de centrarse en tres aspectos principales: (1) si el remedio concedido fue apropiado; (2) si las determinaciones de hechos están razonablemente sostenidas por la prueba y (3) si las conclusiones de derecho del organismo administrativo son correctas. P.R.T.C. Co. v. J. Reg. Tel. de P.R., 151 DPR 269, 281 (2000). Podemos decir que la deferencia reconocida a la decisión de una agencia administrativa cede en las siguientes circunstancias: cuando no está basada en evidencia sustancial, cuando el organismo administrativo ha errado en la aplicación de la ley y cuando ha mediado una actuación irrazonable o ilegal. T-JAC, Inc. v. Caguas Centrum Limited, 148 DPR 70, 80 (1999).

Las determinaciones de hechos de los organismos y agencias administrativas tienen a su favor una presunción de regularidad y corrección. Henríquez v. Consejo Educación Superior, 120 DPR 194, 210 (1987). De manera que los tribunales apelativos no intervienen con las determinaciones de hechos formuladas por una agencia administrativa si éstas están sostenidas por evidencia sustancial que surja del expediente administrativo. Asoc. Vec. H. San Jorge v. U. Med. Corp., 150 DPR 70, 75 (2000).

Según lo ha definido el Tribunal Supremo en diversas ocasiones, evidencia sustancial es "aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión". Hilton Hotels v. Junta Salario Mínimo, 74 DPR 670, 687 (1953). Por ello, quien impugne las determinaciones de hechos de una agencia administrativa tiene el deber de presentar ante el foro judicial la evidencia necesaria que permita, como cuestión de derecho, descartar la presunción de corrección de la determinación administrativa. El peso de la prueba descansa entonces sobre la parte que impugna la determinación administrativa. Com. Vec. Pro-Mej., Inc. v. J.P., 147 DPR 750, 761 (1999). Además, debe demostrar que existe otra prueba en el expediente que reduzca o menoscabe el valor probatorio de la evidencia impugnada, hasta el punto de que no se pueda concluir que la determinación de la agencia fue razonable de acuerdo con la totalidad de la

prueba que tuvo ante su consideración. Rebollo v. Yiyi Motors, 161 DPR 69, 76-77 (2002).

Las conclusiones de derecho, tal y como surge de la Sección 4.5 de la LPAU, *supra*, pueden ser revisadas en todos sus aspectos. 3 LPRA sec. 9675. Sin embargo, esto no significa que, al ejercer su función revisora, podamos descartar liberalmente las conclusiones e interpretaciones de la agencia, sustituyendo el criterio de ésta por el propio. "Al evaluar los casos es necesario distinguir entre cuestiones de interpretación estatutaria, en la que los tribunales son especialistas, y cuestiones propias para la discreción o pericia administrativa". Adorno Quiles v. Hernández, 126 DPR 191, 195 (1990).

El foro judicial podrá sustituir el criterio del organismo administrativo por el propio únicamente en aquellas ocasiones que no encuentre una base racional que fundamente la actuación administrativa. No obstante, es axioma judicial que, ante la prueba pericial y documental, el tribunal revisor se encuentra en igual posición que el foro recurrido y, por tanto, está facultado para apreciar la prueba apoyándose en su propio criterio. Dye-Tex de P.R., Inc. v. Royal Ins. Co., 150 DPR 658, 662 (2000).

Sin embargo, la deferencia judicial en la revisión de determinaciones administrativas no conlleva la renuncia de este Tribunal a su función revisora. Simplemente, define el carácter limitado de la función revisora a casos apropiados. La deferencia reconocida no equivale a la dimisión de la función revisora de este foro apelativo intermedio en instancias adecuadas y meritorias, como resulta ser cuando la agencia ha errado en la aplicación de la ley. Reyes Salcedo v. Policía de P.R., 143 DPR 85, 94 (1987).

**B.**

La Ley Núm. 4 del 11 de octubre de 1985, según enmendada, mejor conocida como la "Ley de la Oficina del Comisionado de Instituciones Financieras" (en adelante, "Ley Núm. 4"), se creó con el fin ulterior de proteger los intereses de las personas que están vinculadas a las industrias de la banca, de valores y de instituciones financieras en Puerto Rico por ser

depositantes, acreedores, accionistas u otro tipo de asociación. *Véase*, Exposición de Motivos de la Ley Núm. 4, *supra*. Para cumplir con dicho propósito, se creó la OCIF, quien es la responsable de fiscalizar y supervisar las entidades financieras que operen o hagan negocios en Puerto Rico, incluyendo a las organizadas bajo la Ley Núm. 52 de 11 de agosto de 1989, *infra*. Entre las facultades del Comisionado de la OCIF, se encuentran las siguientes, a saber: (1) reglamentar sus procedimientos y normas de trabajo; (2) atender, investigar y resolver querellas; (3) interponer cualquier remedio, acción o procedimiento legal que sea necesario o conveniente para hacer efectivos los propósitos de dicho estatuto; (4) llevar a cabo todas las acciones requeridas para lograr eficazmente los objetivos de la ley e (5) imponer multas administrativas por las violaciones a las leyes que administra o a las reglas, reglamentos y órdenes aprobados o dictados por él. 7 LPRA sec. 2010.

En lo aquí pertinente, el inciso (b) del Artículo 10 de la Ley Núm. 4, *supra*, dispone que, cuando la institución financiera no cuente con una situación económica estable, el Comisionado podrá tomar el control y administración de la institución financiera y nombrar un síndico. En detalle, establece lo siguiente:

> **Si como consecuencia de una auditoría, examen o inspección o de un informe rendido por un examinador, se demuestre que la institución financiera carece de una situación económica y financiera sólida o que está operada o administrada de tal manera que el público o las personas y entidades que tengan fondos o valores bajo su custodia estén en peligro de ser defraudados y en ausencia de disposición específica en la ley que regule la institución financiera en cuestión y que lo faculte similarmente, el Comisionado podrá asumir la dirección y administración de la institución financiera, y nombrar con prontitud un síndico, que en el caso de instituciones financieras aseguradas podrá ser su ente asegurador**. El Comisionado deberá celebrar una vista antes de emitir una orden para colocar una institución financiera bajo su dirección o la de un síndico. No obstante, **el Comisionado podrá emitir una orden provisional nombrando un síndico administrador sin necesidad de celebrar una vista cuando a su juicio la situación de la institución financiera sea de tal naturaleza que se esté causando o pueda causarse daño irreparable a los intereses de la misma, o de las personas y entidades con fondos o valores en la institución**.
>
> Cuando el Comisionado emita una orden provisional a los fines de nombrar un síndico, deberá notificar al Gobernador los detalles y fundamentos de su determinación y deberá celebrar

una vista administrativa dentro de los diez (10) días siguientes a la fecha de notificación de la misma para determinar si se hace permanente o se revoca. El síndico así nombrado administrará la institución financiera de acuerdo a las disposiciones de la ley y reglamentos que gobiernan dicha institución y a tenor con los reglamentos promulgados por el Comisionado para sindicaturas o medidas de emergencia declaradas bajo esta sección de ley.

Dicha sindicatura terminará con la total liquidación de la institución financiera si así fuere necesario o cuando las operaciones de la misma según lo certifique el síndico, permitan, a juicio del Comisionado, devolver la administración de la institución a sus funcionarios y oficiales, debidamente electos y nombrados, bajo aquellas circunstancias que estipule el Comisionado. El Comisionado podrá fijar una compensación razonable por los servicios del síndico y los empleados de éste. La determinación del Comisionado de asumir la administración y dirección de una institución financiera o de nombrar un síndico podrá ser revisada por el Tribunal del Circuito de Apelaciones, mediante recurso radicado dentro del término de diez días contados a partir de la fecha de la determinación. 7 LPRA sec. 2010 (b) (énfasis suplido).

En otras palabras, si una auditoría, inspección o examen demuestra que la institución financiera carece de estabilidad económica o que está siendo gestionada de forma que ponga en peligro los fondos de los clientes, el Comisionado tiene la facultad de nombrar un síndico de inmediato. No será necesaria la celebración de una vista, cuando a su juicio, la situación sea de tal gravedad que esté causando, o pueda causar un daño irreparable a los intereses de la institución o de las personas y entidades con fondos y valores en ella. En relación con la imposición de penalidades, el Artículo 20 de la referida ley establece que el Comisionado puede imponer multas administrativas que no excedan de cinco mil dólares ($5,000.00), por cada día que la entidad financiera deje de cumplir con las órdenes dictadas bajo las disposiciones de dicho estatuto. Sin embargo, la acumulación de multas bajo esta disposición estatutaria no puede exceder la suma de cincuenta mil dólares ($50,000.00). 7 LPRA sec. 2020.

En consonancia con lo anterior, el Reglamento Núm. 9551 de 11 de abril de 2024 de la OCIF, conocido como el "Reglamento de Procedimientos Adjudicativos de la Oficina del Comisionado de Instituciones Financieras" (en adelante, "Reglamento Núm. 9551"), fue promulgado en virtud de la Ley Núm. 4, *supra*, con el objetivo de establecer las normas y reglas que aplicarán a los procedimientos adjudicativos de la OCIF, como parte de los procesos de

supervisión y fiscalización de las instituciones financieras. <u>Reglamento Núm. 9551</u>, Sección 1.3. Dicho cuerpo reglamentario es aplicable únicamente a los procedimientos adjudicativos que se llevan a cabo en la OCIF. En este sentido, cualquier controversia relacionada con la labor de los síndicos designados en entidades financieras bancarias deberá resolverse ante la OCIF, donde regirán las normas establecidas en este Reglamento, sin posibilidad de recurrir a los tribunales de justicia antes de agotar dicho procedimiento.

**C.**

La Ley Núm. 52 de 11 de agosto de 1989, según enmendada, mejor conocida como la "Ley Reguladora del Centro Bancario Internacional" (en adelante, "Ley Núm. 52"), fue promulgada con el objetivo de promover que las entidades bancarias internacionales lleven a cabo negocios y actividades en Puerto Rico de manera competitiva y eficiente. *Véase*, Exposición de Motivos de la Ley Núm. 52, *supra*. A fin de cumplir este propósito, el citado estatuto amplió considerablemente el número de personas y entidades que pueden participar, así como el alcance de los negocios que pueden llevarse a cabo bajo su marco. <u>Íd</u>. De igual manera, aumentó los incentivos económicos para hacerla más atractiva, flexibilizó la forma de organizar las entidades bancarias internacionales y eximió a las personas y entidades extranjeras del pago de contribuciones sobre la distribución de dividendos y beneficios. <u>Íd</u>. Entre las facultades y deberes que la ley le otorga al Comisionado, se encuentran las siguientes: (1) supervisar, fiscalizar y auditar las entidades bancarias internacionales; (2) asegurar la estabilidad financiera y adecuacidad operacional de las entidades bancarias internacionales; (3) **revocar o suspender una licencia para operar una entidad bancaria internacional, así como imponer otras sanciones que pueda creer necesarias, de conformidad con su reglamentación** y (4) llevar a cabo todos los actos y remedios que sean necesarios para el cumplimiento de la ley. 7 LPRA sec. 232a.

En lo que respecta a la controversia ante nos, la Sección 18 de la Ley Núm. 52, *supra,* regula lo concerniente a la revocación, suspensión o renuncia de las licencias de operación de entidades bancarias internacionales. En específico, indica lo siguiente:

(a) **La licencia expedida bajo la Sección 7 de esta Ley estará sujeta a ser revocada o suspendida por el Comisionado, previa notificación y vista** con arreglo al reglamento provisto en la Sección 23 de esta Ley, si:

(1) **Una entidad bancaria internacional, o la persona de la cual dicha entidad bancaria internacional es una unidad, contraviene o no cumple con cualquiera de las disposiciones de esta Ley**, **cualquier reglamento del Comisionado, cartas circulares, documentos guía aplicables a las EBIs, cualquier orden emitida por el Comisionado o acuerdos de entendimiento establecidos de conformidad con esta Ley**, o cualquiera de los términos y condiciones de la licencia para operar una entidad bancaria internacional.
(2) Una entidad bancaria internacional no paga el cargo anual por licencia.
(3) **El Comisionado encontrase que el negocio o asuntos de una entidad bancaria internacional son conducidos en una manera no consistente con el interés público**.
(4) Si se determinare que existe algún hecho que de haber existido o haberse conocido al momento en que se expidió o renovó la licencia hubiere sido causa suficiente para denegar la misma, o si descubre que la entidad bancaria internacional ha sometido información falsa, incorrecta, o engañosa, el Comisionado llevará a cabo las acciones relativas a la revocación, cancelación o suspensión de licencia conforme a los poderes y facultades que le confiere la Ley Núm. 4 y a tenor con la LPAU. 7 LPRA sec. 232n (énfasis suplido).

Esto es, el Comisionado tiene la potestad de revocar la licencia de alguna entidad bancaria internacional cuando ésta no cumpla con las disposiciones de la Ley Núm. 52, *supra*, o con cualquier acuerdo u orden que el comisionado haya emitido. En línea con lo anterior, la Sección 19 de la ley Núm. 52, *supra*, dispone que el Comisionado también posee la facultad de nombrar un síndico y ordenar la disolución de una entidad bancaria internacional cuando la licencia de dicha entidad ha sido revocada o cuando algún accionista o integrante es convicto por un delito grave o por un delito que implique fraude, lavado de dinero, evasión contributiva o depravación moral. 7 LPRA sec. 232o (a). El síndico será el encargado de: (1) tomar posesión de los activos, pasivos y archivos que le pertenezcan a la entidad bancaria internacional; (2) cobrar los préstamos, cargos y honorarios que

adeude la entidad; (3) satisfacer las deudas y obligaciones de la entidad bancaria internacional, luego de realizar el pago de los gastos necesarios de la sindicatura; y (4) supervisar la disolución y liquidación de la entidad bancaria internacional. 7 LPRA sec. 232o (c).

Por último, respecto a las penalidades, la Sección 20 del referido estatuto establece que el Comisionado está autorizado a imponer: (1) multas administrativas no menores de cinco mil dólares ($5,000.00), ni mayores de veinticinco mil dólares ($25,000.00) por cada violación a las disposiciones de la ley; (2) la restitución o reembolso de aquellos pagos recibidos en contravención a las disposiciones del estatuto; y (3) multas administrativas no menores de mil dólares ($1,000.00) ni mayores de diez mil dólares ($10,000.00) por cada día en que la entidad bancaria deje de cumplir con los requerimientos u órdenes dictadas por el Comisionado. 7 LPRA sec. 232p.

**D.**

Es norma conocida en nuestro ordenamiento jurídico que, ante la ausencia de error manifiesto, prejuicio, parcialidad o pasión, no se favorece la intervención de los tribunales apelativos para revisar la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos formuladas por el Tribunal de Primera Instancia o por las agencias administrativas. Ortiz Ortiz v. Medtronic Puerto Rico Operations, Co., 209 DPR 759, 779 (2022). Al respecto, la Regla 42.2 de las Reglas de Procedimiento Civil dispone que "[l]as determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos". 32 LPRA Ap. V, R. 42.2.

Es decir, un tribunal apelativo no tiene facultad de sustituir por sus propias apreciaciones las determinaciones del foro de instancia o de las agencias. Serrano v. Auxilio Mutuo, 171 DPR 717, 741 (2007). La razón jurídica detrás de esta normativa se fundamenta en la apreciación que hace el adjudicador de los hechos de la prueba testifical, porque al ser una tarea

llena de elementos subjetivos, es él quien está en mejor posición para aquilatarla. Sucn. Rosado v. Acevedo Marrero, 196 DPR 884, 917 (2016). El Tribunal de Primera Instancia y las agencias son los foros que tiene la oportunidad de escuchar el testimonio y apreciar el comportamiento de los testigos. Dávila Nieves v. Meléndez Marín, 187 DPR 750, 771 (2013). Basándose en ello, adjudica la credibilidad que le merecen los testimonios. Así, la declaración directa de un sólo testigo, de ser creída por el juzgador de hechos, es prueba suficiente de cualquier hecho. SLG Rivera Carrasquillo v. AAA, 177 DPR 345, 357 (2009).

A tenor con lo anterior, se le concede respeto a la adjudicación de credibilidad realizada por el juzgador primario de los hechos, dado que el foro apelativo cuenta solamente con "récords mudos e inexpresivos". Trinidad v. Chade, 153 DPR 280, 291 (2001). No obstante, la norma de deferencia judicial tiene límites y no supone una inmunidad absoluta frente a la función de los tribunales revisores. El Tribunal Supremo aclaró en Dávila Nieves v. Meléndez Marín, *supra*, por primera vez, qué constituye que un juzgador de los hechos adjudique con pasión, prejuicio o parcialidad, o que su determinación sea un error manifiesto. Allí se concluyó que un juzgador incurre en pasión, prejuicio o parcialidad si actúa "movido por inclinaciones personales de tal intensidad que adopta posiciones, preferencias o rechazos con respecto a las partes o sus causas que no admiten cuestionamiento, sin importar la prueba recibida en sala e incluso antes de que se someta prueba alguna". Íd., pág. 782.

Por otro lado, se consideran claramente erróneas las conclusiones del foro revisado si de un análisis de la totalidad de la evidencia, el foro apelativo queda convencido de que "se cometió un error, [...] [porque] las conclusiones están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida". Íd., pág. 772. En otras palabras, incurre en un error manifiesto cuando "la apreciación de esa prueba se distancia de la realidad fáctica o es inherentemente imposible o increíble". Pueblo v. Toro Martínez, 200 DPR 834, 859 (2018).

Por lo tanto, la facultad de los tribunales apelativos para sustituir el criterio de los tribunales de instancia o de las agencias administrativas se reduce a aquellas circunstancias en las que, a la luz de la prueba admitida, "no exista base suficiente que apoye su determinación". Gómez Márquez et al. v. El Oriental, 203 DPR 783, 794 (2020). Como es conocido, las diferencias de criterio jurídico no cumplen con el referido estándar de revisión. Íd.

**III.**

En el presente caso, TBB nos solicitó la revocación de la *Resolución* emitida por la OCIF en la que le revocó la licencia de entidad bancaria internacional y le designó un síndico, de forma permanente.

Los señalamientos de error núm. (1), (2), (4) y (5) están estrechamente relacionados, por lo que se abordarán de manera conjunta en la discusión. En síntesis, el Recurrente alega que la OCIF erró al: (1) nombrar un síndico, al amparo de la Ley Núm. 4, *supra*, (2) no cumplir con los requisitos para establecimiento de la sindicatura, bajo la Ley Núm. 52, *supra*, (3) revocar la licencia del banco sin notificación y vista previa e (4) imponerle multas en violación a su debido proceso de ley. No nos convence su postura. Veamos.

Surge del expediente ante nuestra consideración que el 10 de febrero de 2020, el Recurrente suscribió con OCIF cierto acuerdo intitulado "**Emergency Consent Order**", con el propósito de proteger los intereses de los depositantes y el público en general ante la situación de emergencia existente por la condición financiera de TBB. Dicho documento le requería al Recurrente desarrollar un plan de restructuración de acuerdo con los parámetros allí establecidos, rehabilitar la condición financiera de la entidad bancaria internacional y crear un comité de depositantes, encabezado por el señor Benacerraf Farías. El plan fue aprobado por el Comité de Depositantes el 5 de marzo de 2020 y éste indicaba expresamente que para el 31 de diciembre de 2019 la posición de capital de TBB se encontraba en negativo $32,284,731.00. Cabe resaltar que la implementación total de este plan estaba predicada en que la OCIF tuviera acceso continuo a su cuenta maestra

en el Banco de la Reserva Federal de Nueva York. Además, la Sección IX del plan establecía que éste llegaría a su fin si la cuenta maestra se cerraba.

Así las cosas, el 6 de marzo de 2020, el Recurrente le presentó el Plan a la OCIF para su aprobación y este emitió un "**Lifting Emergency Consent Order**", a través del cual aprobó el plan y dejó sin efecto el "**Emergency Consent Order**". Esta nueva Orden le impuso varios términos y condiciones a TBB, entre los cuales se encuentran los siguientes: (1) cumplir en su totalidad con los términos del Plan; (2) operar la entidad bancaria internacional con un nivel adecuado de capital, tomando en consideración el volumen y tipo de activos que posee TBB; (3) efectuar los pagos de depósitos en un plazo de cinco (5) años, a partir de la fecha del "**Lifting Emergency Consent Order**"; y (4) operar de conformidad con las leyes y reglamentos aplicables.

Posteriormente, el 7 de junio de 2022, el Banco de la Reserva Federal de Nueva York le informó a TBB que el 15 de agosto de 2022 cerraría la cuenta maestra, por lo que se le requirió transferir los fondos restantes en dicha cuenta a otra institución financiera. Más adelante, y a solicitud del Recurrente, la OCIF eliminó la Sección IX del Plan de Reestructuración, la cual indicaba que TBB pasaría a una sindicatura si perdía la cuenta maestra. En respuesta a lo anterior, el TBB le presentó a OCIF tres (3) propuestas para la aprobación de un nuevo plan de reestructuración, las cuales no fueron aceptadas por el Recurrido. Posteriormente, el 17 de octubre de 2023, TBB presentó una cuarta propuesta, la cual fue asignada a la compañía Driven para su evaluación. El 31 de enero de 2024, Driven presentó su Informe Final en el que concluyó que, si se aprueba la referida propuesta, TBB tendría un déficit de capital de negativo $7,464,675.00. El 16 de febrero de 2024, la OCIF le cursó una carta a TBB mediante la cual le solicitó que comentara sobre el aludido Informe.

Más adelante, el 26 de febrero de 2024, la OCIF le envió al Gobernador de Puerto Rico una misiva comunicando su intención de presentar la *Querella y Orden*. Tres (3) días después, presentó dicha *Querella y Orden* en contra del Recurrente. Así las cosas, el 14 de mayo de 2024, se celebró la vista

administrativa. Allí, testificaron bajo juramento las siguientes personas: (1) la señora Rosario Meléndez; (2) el señor Marín Charneco; (3) el señor Benacerraf Farias y (4) el señor Valera Ventura. En lo aquí pertinente, la señora Rosario Meléndez declaró lo siguiente:

> P Pues Cuéntenos un poquito, cuéntenos su envolvimiento con TBB desde junio de 2021.
> R. Pues cua… al tener ese documento para administrarlo, ¿no?, el proceso de seguimiento y monitoreo, resulta, esa Orden por Consentimiento resulta de un examen realizado a la entidad por el área de exámenes de instituciones depositarias al cierre del año 2019. Ese examen comenzó en febrero de 2020 y terminó en diciembre de 2020, o sea, básicamente, un año entero trabajando.
>
> [...]
>
> El propósito del 'consent order' fue trabajar las deficiencias identificadas dentro del examen realizado a la entidad, el cual hubo un resultado crítico en todos los componentes para un resultado de un 'composite' crítico, y tratar de corregir e incorporar junto con los comentarios hechos de la entidad para cumplir con los requerimientos tanto a nivel de calidad de activos, requerimiento de capital, de liquidez, de la gerencia, de la junta de directores, la supervisión, los controles internos y la contabilidad, entre otras cosas.
>
> [...]
>
> P Y dentro de las órdenes que usted, se emitió por la oficina dentro de ese 'consent order' y explíquele al oficial Examinador cuál era el número 2 y el número 9 de esta, de esta orden.
> R El punto número 2, operar la entidad con un nivel adecuado de capital considerando el volumen y el tipo de activos que la entidad tenía en ese momento.
>
> [...]
>
> P ¿A su juicio, TBB cumplió con estos 'Consent Orders' con estas dos disposiciones?
> R No, no cumplió.
> P ¿Por qué?
> R Porque los, no se cumplió con los requerimientos de capital requeridos a nivel de, regulatorios.
> P ¿A qué se refiere con los niveles de capital regulatorios?
> R Según la ley, el tercio de capital pagado, la entidad, según la Ley 52, la definición de insolvencia indica que es una entidad que al momento no puede pagar las deudas que tiene a sus clientes o que no cumple con más de un tercio del capital pagado.
> P ¿Y a su juicio, no estaban en cumplimiento?
> R No.
> P ¿Luego de que se firma este 'Consent Order' en mayo de 2022, qué sucedió luego?
> R Luego de esto, nos indica la entidad de que perdió la cuenta del FED, el 'master account.
>
> [...]
>
> P ¿Cómo, y cómo afectaba este cierre de la cuenta maestra sobre la capitalización de TBB?
> R Dentro del plan de reestructuración se consideraba la cuenta como, como necesaria para continuar con su operación y en caso de que se eliminara la cuenta, pues tenía un efecto de que se iba a liquidación directa. Y además del tema de plan de

reestructuración, el 'Fresh Start Accounting Procedure' fue reversado debido a que ya no tenía ese tipo 'goodwill' dentro de sus activos.

P ¿Y qué efecto tuvo esa reversa del 'Fresh Start Accounting' y el cierre de ese 'master account' en los niveles de capital de TBB?

R Reflejar un nivel de insolvencia de aproximadamente 7 millones de capital deficiente.

P ¿Luego que se cierra el 'master account', qué hizo TBB con la oficina o qué trató de hacer para arreglar sus niveles de capital?

R La entidad viene a la Oficina buscando la, la primero la eliminación de la cláusula que requería una sindicatura inmediata para poder darles la oportunidad de presentar un nuevo plan de capitalización reestructurado, para poder proteger a los depositantes según era el propósito inicial de todo, de toda propuesta, buscando la vía de poder cumplir dentro de la operación y tener el visto bueno de la Oficina, 'per se'.

P O sea, ¿Qué en aquel momento la Oficina le dio la oportunidad de no ponerlos en sindicatura?

R Sí, sí.

P ¿Y cuál era, para efectos, o cuál era la opinión de la Oficina en esos momentos, ya con el cierre del 'master account', cuál era la efectividad del plan de reestructuración del 2020?

R No, para todos los efectos el plan de reestructuración ya no tenía propósito, ya estaba caducado 'per se'.

P Y entonces, ¿qué hizo TBB, quiso hacer propuestas nuevas?

R Se presentaron varias propuestas, se analizaron, se sometió información, se pidió más información buscando llegar a un acuerdo para poder continuar con la, con el plan de que la operación de la entidad continuara, pero al fin de muchas evaluaciones no se pudo lograr.

P Para poner al Oficial Examinador en contexto de fechas, ¿cuándo fue que entonces TBB comenzó con su primera propuesta a la Oficina luego del cierre de la cuenta maestra?

R El primer plan fue en diciembre 9 del 2022.

P ¿Y qué recuerda que haya pasado con esa primera propuesta que ellos, que la entidad envió a OCIF?

R Luego de presentada, se analizó internamente en la Oficina, se elevaron varias interrogantes y preocupaciones, a la cual la entidad trabajó para responder y buscar presentar unos cambios, unas enmiendas al plan que pudieran cubrir la satisfacción de la Oficina.

[…]

P ¿Y qué concluye Driven sobre los niveles de capital de TBB?

R Que estaban descapitalizados.

P okey. ¿A qué fecha es que Driven concluye que está descapitalizado?

R A septiembre 30 de septiembre de 2023.

[…]

P O sea, ¿que en sus propias palabras, el origen de esta querella es por qué, por la capitalización de TBB?

R Sí, debido a que desde el proceso completo de monitoreo de la Oficina ante la entidad y varios exámenes realizados, lo que demostró fue resultados de, de, en desmejora y llegando a un nivel de insolvencia que ameritaba, pues ya esta medida.

[…]

P ¿Y usted entiende que es necesario esto que está haciendo la OCIF mediante esta orden que leyó?

R Sí, es necesario.
P ¿Por qué?
R **La, la entidad viene operando desde el 2009. A esta entidad se le han hecho cinco exámenes de los cuales los resultados han sido en deterioro cada año que se hace examen. Se dio oportunidad con un 'MOU' y dos órdenes por consentimiento que no se cumplieron. Se dio oportunidad con el plan de reestructuración del 2020, el cual tampoco se cumplió.**
**Se ha dado la oportunidad de presentar una propuesta nueva, para, no una, sino varias propuestas, para la reestructuración luego de perder la cuenta de FED y aún así no logran presentar un plan con los requerimientos de la OCIF, cumpliendo con los requerimientos de capital y las inyecciones de capital necesarias para salvaguardar completamente a los depositantes.**[1]

Por otro lado, surge del testimonio del señor Marín Charneco lo siguiente:

P ¿Y dónde usted trabaja ahora mismo?
R Sí, yo soy el socio administrador de la firma Driven PSC
[…]
R El, nosotros fuimos contratados, verdad a través de AFAF, para realizar un análisis de viabilidad basado en la radiografía que presentaba TBB a 9-30 del 2023 de su situación de capital y evaluar si el plan de "Banco Viejo, Banco Nuevo" era viable económicamente, así que nosotros nuestra relación comienza, pues con ese proyecto, ¿verdad? Una vez contratados, el proyecto comienza haciendo una solicitud de documentos que la señora Nora que está presente, nos proveyó y fue muy diligente en el proceso de poder recibir esos documentos, verdad, esa lista de documentos necesarios que fueron recibidos la mayoría, para poder hacer ese análisis, verdad, de cómo se iba a ver el banco, la proyección del banco que presentaron, ¿verdad? Había una proyección de 9-30, de acuerdo a la situación entre Banco Viejo y Banco Nuevo, para nosotros determinar cómo nosotros veíamos o evaluamos esa proyección de división de activos y pasivos entre Banco Viejo y Banco Nuevo y presentar las recomendaciones que presentamos en el informe.
[…]

**Nosotros identificamos, verdad, ciertos ajustes que eran necesarios en el análisis de Banco Viejo y Banco Nuevo, pero la conclusión fue que tanto Banco Viejo como Banco Nuevo no tenían suficientes activos para cubrir las deudas, ¿verdad?, que se iban a presentar en la reestructuración, y por ende, ambos iban a requerir una inyección de capital, según se menciona, ¿verdad?, basados en el déficit de capital que tenían cada uno, que en el Banco Viejo se proyectaba en 7.5 millones redondeado y en Banco Nuevo 1.3 millones redondeado, para una suma total de 8.8 millones.**
P ¿Y eso, ese análisis que usted menciona sobre Banco Viejo y Banco Nuevo, es analizando la propuesta de reestructuración que había sometido TBB?

---

[1] *Véase,* Apéndice del Recurso de Revisión Judicial, págs. 559, 562, 563, 564, 565, 566, 567, 576, 577, 581 y 582 (énfasis suplido).

R Sí, la base fundamental del análisis fue la información provista por el banco, o sea, que si ven en la página 20, por ejemplo, nosotros partimos de los números financieros que fueron provistos por el banco, que reflejaban, verdad, una proyección de déficit total de 7.9, casi 8 millones de dólares. Y a mano derecha, también partimos de cuál era la segmentación que ellos recomendaban de lo que sería pues Banco Viejo y el Banco Nuevo.

[…]

Y eso es lo que modifica un poco verdad, la posición que presentó el banco era de casi 8 millones de déficit, la que Driven entiende y recomienda en su informe, con los hechos de ese momento, es que sumaría alrededor de 8.8 segmentado en que 7.5 sería Banco Viejo y Banco Nuevo, necesitaría una inyección de capital de alrededor de 1.3 millones adicionales.

P O sea, ¿que usted concluyó que había un déficit de capital si se efectuaba la reestructuración o si el banco se mantenía como estaba, en ambos escenarios?

R Correcto.[2]

En esta misma línea, el señor Benacerraf Farías testificó lo siguiente:

P Le pregunto, ¿puede describir la situación en la que se encontraba el banco antes de, durante ese momento previo a que se, verdad, que usted ejerce la función de presidente de la junta de directores del banco? La situación económica.

R **Bueno, el banco había, había, tenía ya cero liquidez, tenía una cola de clientes esperando por sacar su dinero y ya se habían detectado para ese momento 37 millones de dólares de pérdidas (fonética)**.

P ¿Y puede usted profundizar en a qué se le achacaba esa, ese, verdad, ese desfase de 37 millones de dólares en las arcas del banco?

R Había, en mi opinión, había, hubieron (sic) operaciones muy irregulares. Por ejemplo, hubo muchos créditos sin garantías donde el cliente se le obligaba a recibir un crédito y parte del crédito se le obligaba a depositar en las cuentas en los antiguos, del antiguo administrador principal. Hubo casos de inversión, de carteras de inversiones donde los bonos estaban hipotecados. Yo creo que Nora puede hacer una exposición mucho más profunda de ese tema, pero hubo muchas operaciones irregulares de ese tipo.

Hubo unas cartas de crédito que no estaban en la contabilidad, unas cartas de crédito en garantía. Hubo pues, el banco tenía un avión que consumía 100,000, gastaba $100,000 mensuales, que fue de las primeras cosas que intentamos vender. Y así sucesivamente pues hubo muchas transacciones que están todas descritas o casi todas en la demanda a RICO, de la que se habló antes, razón por la cual el banco perdió esa cantidad de dinero.

P Usted testificó anteriormente que la OCIF lo había nombrado presidente del comité de depositantes del banco. ¿Por qué razón la OCIF lo nombró presidente de un comité de depositantes del banco?

R Porque se busca con los depositantes mayoritarios y se hicieron acuerdos con la intención de salvar el banco y salvar a los clien…sobre todo a los clientes del banco, porque en aquel

---

[2] *Véase*, Apéndice del Recurso de Revisión Judicial, págs. 622, 623, 629, 632 (énfasis suplido).

momento había unos 80 millones de dólares de depósitos y realmente, pues se iban a perder casi todos, por no decir todos.[3]

Finalmente, y tras evaluar la prueba desfilada durante la vista administrativa, el 6 de septiembre de 2024, la OCIF acogió el Informe provisto por el oficial examinador, le revocó permanentemente la licencia de entidad bancaria internacional a TBB y le impuso una multa agregada ascendente a sesenta mil dólares ($60,000.00).

Tal como hemos señalado en los acápites anteriores, la Ley Núm. 4, *supra*, creó la OCIF, como la entidad encargada de fiscalizar y supervisar las entidades financieras que operan o realizan negocios en Puerto Rico. Las facultades transferidas al Comisionado incluyen atender y resolver querellas, imponer sanciones administrativas y adoptar los remedios que sean necesario para hacer efectivos los propósitos del estatuto. 7 LPRA sec. 2010. Cónsono con lo anterior, el inciso (b) del Artículo 10 de dicha ley, dispone que, cuando se demuestre a través de un examen que la institución financiera no se encuentra en una situación económica sólida o que está operada de tal manera que las personas que tengan fondos bajo su custodia estén en peligro de ser defraudados, dicho funcionario tiene la potestad de nombrar un síndico. No será necesario la celebración de una vista cuando dicha situación sea de tal magnitud que se esté causando o pueda causarse daño irreparable a los intereses de la misma o de las personas con valores en la institución. 7LPRA sec. 2010 (b).

Por su parte, la Ley Núm. 52, *supra*, regula específicamente las entidades bancarias internacionales que llevan a cabo negocios y actividades en Puerto Rico. Al igual que la Ley Núm. 4, *supra*, este estatuto le confiere al Comisionado la facultad de fiscalizar las entidades bancarias internacionales y de realizar todas las acciones necesarias para cumplir con sus objetivos específicos, incluyendo la revocación y suspensión de licencias de estas entidades, así como el nombramiento de síndicos en casos de revocación de licencias. 7 LPRA sec. 232a y 232o (a). En virtud de dicha facultad, la Sección

---

[3] *Véase*, Apéndice del Recurso de Revisión Judicial, págs. 643-645 (énfasis suplido).

18 de dicho estatuto establece que las licencias serán revocadas o suspendidas, previa notificación y vista, cuando la entidad bancaria internacional incumpla con alguna disposición legal, no observe los reglamentos, cartas circulares o documentos guías emitidos por el comisionado, o cuando la operación del negocio sea contraria al interés público. 7 LPRA sec. 232n.

El Recurrente sostiene que la OCIF no podía nombrar un síndico de carácter provisional, sin celebrar una vista administrativa, y que el Artículo 10 de la Ley Núm. 4, *supra*, es inaplicable a la presente controversia, puesto que ya la Ley Núm. 52, *supra*, regula lo concerniente a las entidades bancarias internacionales. Asimismo, argumenta que la OCIF no demostró en la vista administrativa celebrada que se hubieran realizado auditorías, exámenes o inspecciones para conocer la situación económica de TBB, ni que los fondos de las personas o entidades hayan estado en peligro de ser defraudados. Además, afirma que debió haberse celebrado una vista distinta para atender el asunto de la imposición de multas. Nada más lejos de la verdad.

Tras un análisis detallado y riguroso del expediente ante nuestra consideración, incluyendo la transcripción de la prueba oral presentada y los correspondientes memorandos de derecho, hemos arribado a la conclusión de que la OCIF actuó correctamente al revocarle la licencia de entidad bancaria internacional a TBB e imponerle un síndico, de manera permanente. Estas acciones están claramente respaldadas por las facultades otorgadas al Comisionado de la OCIF en la Ley Núm. 4, *supra*, y en la Ley Núm. 52, *supra*. Nótese que ambas piezas legislativas le facultan a supervisar las entidades financieras que operan en Puerto Rico e implementar cualquier medida necesaria para cumplir con los propósitos de dichos estatutos, incluyendo la revocación de licencias y el nombramiento de síndicos.

Específicamente, el Artículo 10 de la Ley Núm. 4, *supra*, autoriza al Comisionado a nombrar un síndico cuando, como resultado de un examen, se evidencia que la entidad no tiene una situación económica estable. En este caso, según se desprende claramente del testimonio de la señora Rosario

Meléndez, se realizaron cinco (5) exámenes que demostraron que TBB no contaba con una situación financiera estable. Por el contrario, las investigaciones revelaron un déficit de capital en la entidad bancaria que fluctuaba entre 7 y 8 millones de dólares. De hecho, el propio presidente de la Junta de Directores de TBB, el señor Benacerraf Farías, reconoció que en un momento dado se detectaron treinta y siete millones de dólares ($37,000,000.00) en pérdidas.

Sostenemos, pues, que es evidente que esa crítica situación económica planteaba un riesgo significativo de daño irreparable a los intereses de los depositantes, personas y entidades con fondos o valores en la institución, lo que facultaba al Comisionado a nombrar un síndico administrador, sin la necesidad de celebrar una audiencia, según lo establece la Ley Núm. 4, *supra*. Este panorama de inestabilidad financiera también generaba incertidumbre sobre la capacidad de TBB para cumplir con sus obligaciones, amenazando así tanto los activos de los involucrados, como la credibilidad de la institución.

La OCIF no sólo contaba con la facultad de nombrar a un síndico bajo la Ley Núm. 4, *supra,* sino que también cumplió con los requisitos establecidos en la Sección 19 de la Ley Núm. 52, *supra*, para proceder con dicho nombramiento. Nótese que la referida Sección establece que se puede designar un síndico y ordenar la disolución de una entidad bancaria cuando su licencia ha sido revocada. Dicha legislación faculta al Comisionado a revocar la licencia de una entidad cuando esta incumple con los términos y condiciones establecidos para operar o cuando sus actividades son conducidas de manera inconsistente con el interés público. En este caso, TBB no cumplió con el requisito de mantener su cuenta maestra en el Banco Federal de Nueva York, tal como lo exigía la OCIF. Este incumplimiento reveló una falta de diligencia en el manejo de sus obligaciones financieras, lo que provocó que la OCIF tomara las medidas adecuadas para resolver tal situación. Además, las operaciones de TBB se realizaban de manera incompatible con el interés público, ya que la crisis económica que afectaba

a la entidad comprometía gravemente su estabilidad interna y los intereses de las personas con fondos o valores en ella. Dicha insolvencia financiera, acompañada de la creciente incertidumbre, explicaba la urgente necesidad de nombrar a un síndico.

Cabe subrayar que el nombramiento de un síndico no fue la primera, ni la única medida adoptada por la OCIF. La agencia eliminó la cláusula que exigía una sindicatura inmediata para permitir que TBB presentara un plan de capitulación reestructurado y le ofreció cuatro (4) oportunidades para presentar propuestas de reestructuración. No obstante lo anterior, ninguna de las propuestas cumplió con los requisitos de la OCIF, por lo que fueron rechazadas. Por otro lado, el razonamiento de que, antes de la presentación de la *Querella y Orden*, la OCIF debió haber celebrado una vista administrativa para nombrar provisionalmente un síndico, resulta ser puramente académico. En realidad, ya se celebró una audiencia el 14 de mayo de 2024, en la cual TBB tuvo la oportunidad de presentar su prueba, ser escuchado y exponer sus argumentos en defensa de su postura. Este punto debió haberse presentado antes de la celebración de la vista, pues esta realidad fáctica en unión con la prueba aportada durante la misma, corrigió cualquier posible error en el procedimiento. Así pues, considerando que a TBB se le brindó amplia oportunidad de exponer su caso y de presentar prueba a su favor, consideramos que no se incurrió en violación alguna de su debido proceso de ley al proceder con la revocación de la licencia y el nombramiento de un síndico. Además, aun si ignoráramos lo anterior, la Ley le confiere la potestad al Comisionado de la OCIF a nombrar un síndico, sin la necesidad de celebrar una vista.

Por último, el inciso (c) del Artículo 20 de la Ley Núm. 4, *supra*, autoriza expresamente al Comisionado de la OCIF a imponer multas administrativas que no excedan de cinco mil dólares ($5,000.00) por cada día que la entidad bancaria deje de cumplir con las órdenes de dicha entidad gubernamental. 7 LPRA sec. 2020 (c). La acumulación de estas multas no puede exceder de $50,000.00. Íd. Del mismo modo, la Sección 20 de la Ley Núm. 52, *supra*, le

permite al Comisionado imponer multas administrativas no mayores de diez mil dólares ($10,000.00) por cada día que la entidad bancaria internacional deje de cumplir con los requerimientos dictados por el Comisionado. En el presente caso, TBB no cumplió con el "**Lifting Order**" ni con el Plan de Reestructuración del 5 de marzo de 2020, por lo que OCIF actuó correctamente al imponer la multa de $50,000.00. Por otro lado, TBB tampoco cumplió con el nivel de solvencia requerido por la Ley Núm. 52, *supra*, esto es, los pasivos del banco excedían sus activos. Lo anterior justifica la imposición de una multa adicional de $10,000.00. Nótese que no era necesaria la celebración de una nueva vista administrativa para dilucidar el asunto de las penalidades, puesto que TBB tuvo la oportunidad de defender su postura el 14 de mayo de 2024, cuando se celebró la vista en el presente caso, salvaguardándose así su debido proceso de ley. Por las razones anteriormente expuestas, no se cometieron los errores esgrimidos.

Como tercer señalamiento de error, la Recurrente alega que la OCIF incidió al obligarlo a dilucidar las controversias relacionadas a la sindicatura exclusivamente en un proceso administrativo ante la OCIF. Veamos.

Surge del expediente ante nuestra consideración que la *Querella y Orden* establece que las disputas relacionadas con la labor del síndico deberán resolverse dentro de un procedimiento adjudicativo administrativo ante la OCIF. En detalle, dispone lo siguiente:

> **Las controversias relacionadas con el desempeño del Síndico en el manejo de los asuntos de la disolución y liquidación de la entidad bancaria internacional podrán traerse a la atención de la OCIF únicamente dentro de un proceso de adjudicación administrativa conforme al Reglamento núm. 9551**. Cualquier reclamación o controversia presentada antes de comenzar a contar el término jurisdiccional de treinta (30) días dispuesto en la denegatoria de alguna reclamación, se entenderá prematura. Las partes interesadas deberán agotar remedios administrativos antes de poder llevar sus reclamos a los tribunales de justicia de Puerto Rico.(énfasis suplido).[4]

Conforme se ha adelantado, la Ley Núm. 4, *supra*, otorga al Comisionado de la OCIF la facultad para atender y resolver querellas, así

---

[4] *Véase*, Apéndice del Recurso de Revisión Judicial, pág. 783.

como para nombrar síndicos en aquellos casos que lo ameriten. En concordancia con ello, el Reglamento Núm. 9551, *supra*, fue creado para establecer las normas que regulan los procedimientos adjudicativos de la OCIF dentro de su rol de supervisión y fiscalización de las instituciones financieras. Por lo tanto, cualquier controversia relacionada con la actuación de los síndicos designados a entidades bancarias internacionales debe resolverse ante la OCIF, conforme a las disposiciones de este Reglamento, sin posibilidad de recurrir a los tribunales –en jurisdicción original– hasta que se haya agotado dicho procedimiento.

Esta disposición se enmarca en la doctrina de agotamiento de remedios administrativos, que exige a los tribunales abstenerse de intervenir en la revisión de las decisiones de la agencia hasta que la parte afectada haya agotado todos los recursos administrativos disponibles, garantizando así que la decisión final represente la postura definitiva de la agencia. Colón Rivera et al. v. ELA, 189 DPR 1033, 1057 (2013). Es preciso señalar que esta práctica salvaguarda en su totalidad el derecho al debido proceso de ley de las partes, dado que no se les está restringiendo el acceso a la vía judicial, sino que simplemente se está determinando la etapa en el que pueden ejercer este derecho. Es decir, de ninguna manera se le está limitando a TBB la posibilidad de acudir ante los tribunales en caso de estar inconforme con alguna determinación que, en su día, emita el síndico designado. Simplemente, se le está reconociendo la pericia a la agencia encargada de dirimir primeramente cualquier controversia que surja, al tiempo que se le reconoce su derecho de acudir en revisión judicial si está en desacuerdo con cualquier determinación del ente administrativo. Por consiguiente, no se cometió el error señalado.

Como sexto señalamiento de error, TBB plantea que la OCIF erró al incorporar por referencia las disposiciones del *Federal Deposit Insurance Corporation* (por sus siglas en inglés, "FDIC") en la Orden de nombramiento del síndico. Como fundamento para dicha contención, el Recurrente sostiene que las disposiciones del *Federal Deposit Insurance Act*, 12 USC secs. 1811 *et seq.*, no pueden ser implementadas ya que el Tribunal Supremo de los

Estados Unidos ha resuelto que las jurisdicciones estatales y territoriales están impedidas de legislar ni adoptar normas relacionadas con quiebra e insolvencia. No le asiste la razón.

Del expediente del presente caso se desprende que la OCIF indicó lo siguiente respecto al procedimiento de liquidación de activos:

El síndico preparará un presupuesto operativo de acuerdo con la condición financiera de TBB a la vez que revise los gastos de la EBI dirigidos a completar la liquidación sin mayor dilación. La intención de esta *Resolución y Orden,* conforme los poderes conferidos a la OCIF en su ley orgánica, es darle preferencia y certeza jurídica al pago de los depósitos de los clientes de TBB. **A estos efectos, y a base de sus poderes amplios dirigidos a lograr el cumplimiento de los propósitos de las leyes bajo su jurisdicción, incluyendo la Ley Núm. 52-1989, la OCIF adopta de manera supletoria y en la medida que sean necesarios, para fines del trámite ordenado de la Sindicatura aquí impuesta, los parámetros de prioridad desarrollados por la FDIC en sus reglamentos aplicables, particularmente aquellos dispuestos en las reglas de "Resolution and Receivership" codificadas en el título 12 CFR Part 360.3.** La compensación dispuesta en la sindicatura se incorporará al presupuesto de gastos de liquidación y serán sufragados por TBB como parte de sus gastos operacionales.

A menos que la OCIF expresamente disponga lo contrario, la distribución de activos de la EBI que el síndico pueda recuperar se hará de conformidad con el siguiente orden de prioridad para el pago de cantidades adeudadas a la fecha de la designación permanente del síndico, disponiéndose que los gastos corriente y ordinarios para ejecutar la liquidación se continuarán haciendo durante el proceso:

1. **Primero**- Gastos Administrativos del síndico (incluyendo aquellos dispuestos en un presupuesto establecido) y, de ser aplicable de l a OCIF, relacionados a la liquidación, incluyendo, aquellos por compensación y/o gastos razonables incurridos por profesionales retenidos por el síndico y, de ser aplicable, multas o derechos de examen adeudados a la OCIF;

2. **Segundo**- Deudas aseguradas (aquellas cuyo repago está garantizado con algún colateral), si alguna, adeudadas a la fecha de designación del síndico, a pagarse del producto de su respectivo colateral;

3. **Tercero**- Deudas para con los Depositantes, adeudadas a la fecha de designación del síndico, excluyendo aquellas para alegaciones de daños;

4. **Cuarto**- Deudas, a la fecha de designación del síndico, por (1) impuestos, contribuciones, multas y penalidades de agencias federales y estatales, y (ii) pagos adeudados a empleados por salarios y/o comisiones devengadas en los 180 días antes de la fecha de designación del síndico;

5. **Quinto**: Reclamaciones Generales No Aseguradas adeudadas a la fecha de designación del síndico, incluyendo, pero sin limitarse, a reclamaciones de daños, sean estas contractuales o extracontractuales; y

6. **Sexto**- Cualquier obligación para con los accionistas o los miembros de la EBI que haya surgido como resultado de la EBI o los beneficiarios finales de TBB ("ultimate beneficial owners").[5]

La disposición citada muestra claramente que la OCIF no está legislando ni estableciendo normas federales a un proceso de insolvencia, como argumenta la Recurrente. Al contrario, está indicando el orden en que se distribuirán los activos de la entidad bancaria internacional, utilizando como punto de referencia las disposiciones de la FDIC. Dicha actuación se encuentra dentro de sus amplias facultades para asegurar el cumplimiento de los objetivos establecidos en las leyes bajo su jurisdicción. Esto pues, tanto la Ley Núm. 4, *supra*, como la Ley Núm. 52, *supra*, le conceden expresamente al Comisionado la autoridad para realizar todos aquellos actos e imponer aquellos remedios que sean necesarios o convenientes para hacer cumplir dichos estatutos. 7 LPRA sec. 232a y 2010. Siendo ello así, no vemos cómo la OCIF se excedió en sus facultades al adoptar, de manera supletoria y como referencia, los parámetros de prioridad desarrollados por la FDIC.

Por último, TBB alega que la OCIF erró al realizar la determinación de hecho núm. 43.E, ya que la misma no está sustentada por el expediente ni por la evidencia presentada. No nos convence su argumento.

Surge del expediente ante nuestra consideración que entre las personas que declararon, bajo juramento, en la vista administrativa celebrada el 14 de mayo de 2024, se encuentra la ayudante ejecutiva de la OCIF, la señora Rosario Meléndez. La OCIF, luego de escuchar y analizar su testimonio, realizó la siguiente determinación de hechos:

Estableció que, a partir del 3 de junio de 2021, ha estado trabajando con los asuntos relacionados a TBB, los que incluyen exámenes financieros, el *Consent Order* y el Emergency Order. En específico, informó que el *Consent Order* fechado el 23 de mayo de 2022 prevalece sobre los demás y tuvo el efecto de dejar sin efecto y validez el *Emergency Order* del 2020. Que el *Consent Order* tenía como propósito trabajar las deficiencias identificadas dentro del examen realizado a la entidad, el cual obtuvo un resultado crítico en todos los componentes, para así tratar de corregir las deficiencias e incorporar, junto con los comentarios hechos a la entidad, planes y mejoras para cumplir con los requerimientos de nivel de calidad de activos,

---

[5] *Véase*, Apéndice del Recurso de Revisión Judicial, págs. 781 y 782 (énfasis suplido y en el original).

requerimiento de capital, de liquidez, de la gerencia, de la junta de directores, la supervisión, los controles internos y la contabilidad, entre otras cosas.[6]

Conforme hemos adelantado, en ausencia de pasión, perjuicio, parcialidad o error manifiesto, los foros apelativos no debemos intervenir con la apreciación de la prueba y las determinaciones de hecho formuladas por las agencias administrativas. Ortiz Ortiz v. Medtronic Puerto Rico Operations, *supra*, pág. 779. Esto pues, es el adjudicador de los hechos de la prueba testifical, quien se encuentra en mejor posición para aquilatar dicha evidencia. Sucn. Rosado v. Acevedo Marrero, 196 DPR 884, 917 (2016). En consecuencia, nuestra intervención únicamente procede cuando el juzgador ha adoptado posiciones que no admiten cuestionamientos. Dávila Nieves v. Meléndez Marín, *supra*, pág. 782.

Luego de estudiar detenidamente la transcripción de la prueba oral y todos los documentos que forman parte del legajo apelativo, concluimos que no existe base para sustentar la contención del Recurrente de que la determinación Núm. 43.E no está respaldada por la prueba ni la evidencia presentada. Contrario a lo argumentado por TBB, el expediente contiene prueba sustancial de la cual se puede concluir que el *Consent Order* tenía como propósito trabajar las deficiencias identificadas dentro de los exámenes realizados a la entidad y que la situación financiera de TBB era sumamente crítica. Ello se desprende con meridiana claridad de la prueba que desfiló durante la vista y que hemos citado en la presente *Sentencia*.

Así pues, al efectuar nuestra función revisora, no hallamos que la determinación de hecho núm. 43.E haya sido adjudicada con pasión, prejuicio o parcialidad, o que nos permitiera concluir que la OCIF cometió un error manifiesto. En fin, estamos imposibilitados de concluir que el foro recurrido actuó movido por inclinaciones personales de tal intensidad que adoptó posiciones, preferencias o rechazos con respecto a las partes o causas que no admiten cuestionamiento o que no exista en el expediente evidencia sustancial que apoye la misma. Por lo tanto, no se cometió el error esgrimido.

---

[6] Véase, Apéndice del Recurso de Revisión Judicial, pág. 769.

**IV.**

Por los fundamentos que anteceden, los cuales hacemos formar parte del presente dictamen, se *confirma* la *Resolución* recurrida.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones